25 F.3d 1042
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Debbie MATTHEWS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John PONKO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Mark MATTHEWS, Defendant-Appellant.
 Nos. 93-5301, 93-5332, 93-5382.
 United States Court of Appeals, Fourth Circuit.
 Argued: April 15, 1994.
Decided: May 24, 1994.
 
 Appeals from the United States District Court for the Northern District of West Virginia, at Wheeling. Frederick P. Stamp, Jr., District Judge. (CR-92-146)
 Gregory Aaron Gellner, Wheeling, West Virginia, for Appellant Debbie Matthews;
 Donald J. Tennant, Jr., Donald J. Tennant Law Offices, Wheeling, West Virginia, for Appellant Mark Matthews;
 Christopher P. Riley, Riley & Riley, L.C., Wheeling, West Virginia, for Appellant Ponko.
 Lisa Grimes Johnston, Assistant United States Attorney, Wheeling, West Virginia, for Appellee.
 William D. Wilmoth, United States Attorney, Sam G. Nazarro, Assistant United States Attorney, Elgine H. McArdle, Special Assistant United States Attorney, Wheeling, West Virginia, for Appellee.
 N.D.W.Va.
 AFFIRMED.
 Before WIDENER, HALL, and HAMILTON, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 In this consolidated appeal, appellants, Mark Matthews (Mark), his sister, Debbie Matthews (Debbie), and John Ponko (Ponko), appeal the judgment entered by the district court in their respective cases. Finding no error, we affirm.
 
 
 2
 * This case involves numerous offenses relating to a conspiracy to distribute cocaine and marijuana in the Wheeling area of West Virginia from the summer of 1991 through June 1992. The conspiracy was headed by Mark, who generally would fly to Los Angeles, California to purchase drugs and transport them back to Wheeling where he would sell the drugs to other dealers.
 
 
 3
 In June 1992, the appellants were charged in a nine-count indictment with various violations of federal statutes, including conspiracy to possess with intent to distribute and to distribute marijuana and cocaine, 21 U.S.C. Secs. 841(a)(1) and 846 (Count One). Count Two of the indictment charged Debbie and Ponko with knowingly and intentionally employing, hiring, using, persuading or otherwise coercing a person under eighteen years of age to sell cocaine, 21 U.S.C. Sec. 861(a)(1) and 18 U.S.C. Sec. 2. Count Three charged Ponko with distributing marijuana, and aiding and abetting the same, 21 U.S.C. 841(a)(1) and 18 U.S.C. Sec. 2. Count Four charged Ponko with distributing marijuana within 1000 feet of an school, and aiding and abetting the same, 21 U.S.C. Secs. 841(a)(1) and 860 and 18 U.S.C. Sec. 2. Count Five charged Ponko with distributing cocaine within 100 feet of a playground, and aiding and abetting the same, 21 U.S.C. Secs. 841(a)(1) and 860 and 18 U.S.C. Sec. 2. Counts Six and Seven charged Mark with separate distributions of marijuana and cocaine on April 10, 1992, 21 U.S.C. Sec. 841(a)(1). Count Eight charged Debbie with possession with intent to distribute cocaine on April 21, 1992, 21 U.S.C. Sec. 841(a)(1). Count Nine charged Mark with travelling in interstate commerce with the intent to promote, manage, establish and carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity (a business enterprise involving cocaine), 18 U.S.C. Sec. 1952(a)(3).
 
 
 4
 At trial, the government's evidence consisted of the testimony of government undercover agents, co-conspirators, and cooperating witnesses. This testimony outlined how the cocaine and marijuana was procured and distributed. The government's case also consisted of evidence of controlled purchases.
 
 
 5
 The appellants were convicted on all counts, with the exception of Ponko who was acquitted on Count Two. Mark was sentenced to 330 months' imprisonment; Debbie to 108 months' imprisonment; and Ponko to eighteen months' imprisonment.
 
 
 6
 The appellants noted a timely appeal.
 
 II
 
 7
 On appeal, the appellants raise numerous assignments of error, only a few of which merit discussion.
 
 
 8
 * The appellants claim that their due process rights were violated when the government knowingly used the perjured testimony of Craig Phelps to secure their convictions. Phelps, a co-conspirator, purchased cocaine from Mark and Debbie and occasionally traded stolen property for drugs. Phelps also identified Ponko as one who obtained cocaine from Debbie.
 
 
 9
 In May 1992, Phelps entered into a state plea agreement wherein it was agreed that Phelps would not be prosecuted for any breaking and entering charge or other crimes with which he was involved, provided he informed the Ohio County Sheriff's Department and the Ohio County Prosecutor's Office of each and every breaking and entering and other offenses in which he had been involved prior to the interview which accompanied the tender of the plea agreement. Phelps informed the Ohio County Sheriff's Department of various instances of breaking and entering in which he had been involved and was not prosecuted for those offenses. However, Phelps did not advise the Ohio County Sheriff's Department or the Ohio County Prosecutor's Office that he was involved in the burglary of Elsie Dook's residence located at R.D. 1, Box 385, Middle Creek Road, Wheeling, West Virginia, on January 16, 1992. In September 1992, a state grand jury sitting in Ohio County, West Virginia, returned an indictment against Phelps charging him with breaking and entering the Dook's residence. Phelps pleaded not guilty to this charge.
 
 
 10
 At the trial of the instant case (which began in late October 1992 and ended on November 5, 1992), Phelps was extensively crossexamined regarding his criminal history by defense counsel, including the Dook breaking and entering. Consistent with his plea of not guilty, Phelps denied any involvement with the Dook breaking and entering. On December 3, 1992, Phelps pleaded guilty to the Dook breaking and entering pursuant to yet another plea agreement.
 
 
 11
 The appellants contend that the government knowingly used perjured testimony in the prosecution of this case. A prosecutor's knowing use of perjured testimony or knowing failure to disclose that testimony used to convict a defendant was false is a violation of due process, and any conviction must be set aside if there is a reasonable likelihood that false testimony could have affected the judgment. United States v. Bagley, 473 U.S. 667, 678 (1985). The defendant must show that the prosecutor or other government official knew the testimony was false. Stockton v. Virginia, 852 F.2d 740, 749 (4th Cir.1988), cert. denied, 489 U.S. 1071 (1989); United States v. Valentine, 820 F.2d 565, 570 (2d Cir.1987).
 
 
 12
 The appellants' claim fails in several respects. Assuming, arguendo, Phelps' testimony was false, in light of the overwhelming evidence of guilt and the district court's cautionary instruction, there is no reasonable likelihood that the alleged false testimony could have affected the judgment. More fundamentally, even assuming Phelps' testimony was false, there is nothing in the record to suggest that the government at the time knew that Phelps' testimony was false.
 
 B
 
 13
 Mark contends that he was seized by Deputy Sheriff Julio Salcido at an airport in Los Angeles, California, in violation of his Fourth Amendment rights and that this seizure tainted any consent to search his luggage.
 
 
 14
 On May 8, 1992, while working as part of an airport drug task force, Deputy Sheriff Salcido of the Los Angeles County Sheriff's Department received a telephone call from an employee of American Airlines who related that a ticket was just sold to an individual named Mark Matthews. The employee told Deputy Sheriff Salcido that Mark exhibited nervous behavior, had paid cash for a one-way ticket on a flight to Chicago, which would ultimately end up in Pittsburgh, and had paid with small denomination bills.
 
 
 15
 At that point, Deputy Sheriff Salcido, Sergeant Louis Medina, and Deputy Sheriff Foster Johns went to the American Airlines terminal. Mark was located in a snack bar in the terminal. Deputy Sheriff Salcido approached the table at which Mark was sitting, sat down next to him, identified himself as a deputy sheriff, and explained to Mark that he was not under arrest, and free to leave, and that he would just like to speak to Mark for a few minutes. Deputy Sheriff Salcido asked Mark where he was travelling. Mark responded that he was travelling to Pittsburgh. Deputy Sheriff Salcido next asked Mark if he had any identification and whether he had checked any luggage. Mark replied that he had lost his identification and had checked some luggage. Deputy Sheriff Salcido then asked Mark if he could search his luggage. Mark replied that he could, but indicated it might have already been checked. At that point, Deputy Sheriff Salcido thanked Mark for his time and walked downstairs to the American Airlines desk where Mark's luggage was being held by American Airlines. Deputy Sheriff Salcido, along with Deputy Sheriff Johns, took the luggage to an office where they opened it. Inside the luggage, they discovered cocaine, several aluminum cans with screw-on bottoms, and a digital scale. Thereafter, Mark was arrested.
 
 
 16
 As a threshold matter, we must determine whether Mark's stop even implicates the Fourth Amendment. Not all police-citizen encounters amount to a seizure, and therefore do not implicate the Fourth Amendment. United States v. Analla, 975 F.2d 119, 124 (4th Cir.1992), cert. denied, 113 S.Ct. 1853 (1993). In determining whether the encounter is consensual, we focus our attention on "whether a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter." United States v. Rusher, 966 F.2d 868, 877 (4th Cir.), cert. denied, 113 S.Ct. 351 (1992). A seizure does not occur when the officers merely approach the defendant in a public place, ask if he will answer some questions and proceed to ask questions after he indicates a willingness to listen. Florida v. Royer, 460 U.S. 491, 497 (1983). Moreover, a request to search a defendant's person or luggage does not transform the initial questioning into a seizure. United States v. Flowers, 909 F.2d 145, 147 (6th Cir.1990). Finally, the seizure determination is an objective one. Analla, 975 F.2d at 124.
 
 
 17
 When Deputy Sheriff Salcido first sat down next to Mark in the snack bar and explained to Mark that he was free to leave, Mark was not seized. Cf. Id. ("encounter does not become seizure merely because the officers do not tell the defendant that he is free to leave or refuse to comply with their requests"). Deputy Sheriff Salcido neither displayed weapons nor threatened Mark in any way. Mark was free to leave at any time. Thereafter, Deputy Sheriff Salcido asked Mark if he could search his luggage and Mark willingly agreed. A reasonable person in Mark's position would have believed he could terminate the encounter. Accordingly, at the time Mark gave consent, he was not seized within the meaning of the Fourth Amendment.[1]
 
 
 18
 The district court found that Mark's consent was voluntary. "Whether a defendant's consent to search is voluntary is a factual question determined in light of the totality of the circumstances and must be upheld unless clearly erroneous." Id. at 125 (citing United States v. Gordon, 895 F.2d 932, 938 (4th Cir.), cert. denied, 111 S.Ct. 121 (1990)). There being nothing in the record to suggest that Mark's consent to search his luggage was not voluntary, the district court's finding is not clearly erroneous. Accordingly, Mark's motion to suppress was properly denied.
 
 C
 
 19
 Mark and Debbie also appeal the district court's denial of their motion to suppress evidence seized (which included cocaine and other items) during a search of their mother's residence located at 57 Virginia Street. Mark and Debbie contend that the search was made in violation of their Fourth Amendment rights.[2]
 
 
 20
 Phelps gave specific information about stolen property that was located at the 57 Virginia Street residence. Based upon that specific information, Detective Cuchta of the Ohio County Sheriff's Department applied for and received a search warrant to search for two pistols, one shotgun, a computer, two VCRs, one TV, and three[3] camcorders. As the search began, the officers found stolen property not included in the warrant and obtained additional written consent to seize those other items of stolen property. During the search, Detective Cuchta discovered cocaine. At that point, the search was stopped and Detective Cuchta went to procure an additional search warrant to search for controlled substances and evidence of drug related activity. During a further search of the residence, additional evidence of drug related activity was seized.
 
 
 21
 It was determined below that the search was supported by probable cause. We review the legal conclusions involved in a suppression determination de novo, but the factual determinations underlying the legal conclusions are reviewed under the clearly erroneous standard of review. Rusher, 966 F.2d at 873.
 
 
 22
 Determining whether probable cause exists to issue a search warrant for a particular place requires a: [P]ractical, common-sense decision whether, given all the circumstances set forth in the affidavit ... including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.
 
 
 23
 Illinois v. Gates, 462 U.S. 213, 238 (1983).
 
 
 24
 We cannot take issue with the finding made below that probable cause existed to conduct the search. Phelps gave specific information that stolen property would be recovered at the residence. Under the circumstances, there was "a fair probability that contraband or evidence of a crime [would] be found in" the residence. Gates, 462 U.S. at 238. Once the cocaine was found during the search, the officers were clearly justified in obtaining a warrant to search for controlled substances and evidence of drug related activity, and in seizing the cocaine and other evidence of drug related activity found pursuant to the authority of that warrant.[4] Accordingly, the suppression motion was properly denied.[5]
 
 D
 
 25
 Mark challenges the district court's refusal to grant a two-level downward adjustment of his offense level for acceptance of responsibility. The Sentencing Guidelines provide: "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." United States Sentencing Commission, Guidelines Manual, Sec. 3E1.1(a). The determination of whether to apply the reduction of U.S.S.G. Sec. 3E1.1 is a factual issue that is subject to the clearly erroneous standard of review. United States v. White, 875 F.2d 427, 431 (4th Cir.1989). It is the burden of the defendant to demonstrate by a preponderance of evidence that he is entitled to the adjustment. Id. The district court made the following finding at sentencing:
 
 
 26
 I think that the evidence is that the defendant, while admitting on the stand certain counts, did not acknowledge, but rather went to great length to separate himself from any conspiracy or any other counts that would have involved, for example, his sister, the codefendant, Debbie Matthews. This was a case in which I tried to listen very carefully to the testimony of Mr. Matthews at trial. I don't believe that the defendant has accepted responsibility for all of the counts of conviction.
 
 
 27
 (J.A. 1224).
 
 
 28
 We believe Mark's argument has no merit. First of all, Mark made the government go to trial. As the commentary to U.S.S.G. Sec. 3E1.1 indicates, the reduction will rarely be given when the defendant puts the government to its burden of proof. See U.S.S.G. Sec. 3E1.1, comment. (n.2) ("This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt or expresses remorse."). In addition, Mark did not accept responsibility for all of the counts of conviction. At sentencing, the probation officer testified that Mark failed to admit to the conspiracy to distribute cocaine as charged in the indictment and as convicted by the jury. By failing to admit his guilt with respect to the conspiracy, the probation officer determined that Mark failed to accept full responsibility for the criminal activity in which he was involved. Under the circumstances, we cannot conclude that the district court's finding that Mark was not entitled to a reduction for acceptance of responsibility is clearly erroneous.
 
 E
 
 29
 For sentencing purposes, the district court attributed to all the appellants, as relevant conduct, see U.S.S.G. Sec. 1B1.3(a)(1), two ounces of cocaine and one pound of marijuana that was contained in a leather bag. The appellants argue that the district court clearly erred in finding them accountable for the cocaine and marijuana contained in the leather bag. The appellants also argue that, even if they should be held accountable for the cocaine and marijuana, the district court clearly erred in calculating the amount of cocaine and marijuana contained in the bag.[6]
 
 
 30
 Shortly after the search of his mother's residence, Mark called Carman Matthews (Debbie's daughter and Ponko's girlfriend)[7] from Diane Baker's apartment[8] and asked her and Ponko to bring the leather bag to him at Baker's apartment. At Debbie's sentencing on March 29, 1993, Detective Cuchta testified regarding the quantity of drugs contained in the leather bag.[9] Detective Cuchta testified that Baker stated to him that the cocaine filled up about one quarter of a large freezer bag and that from his experience this equated to approximately two ounces of cocaine.[10] In addition, Detective Cuchta testified that Baker stated to him that the marijuana filled up almost all of another large freezer bag and that from his experience this equated to approximately one pound of marijuana. At each sentencing hearing of the appellants, the district court found Detective Cuchta's statements to be reliable.
 
 
 31
 We believe the appellants' arguments are without merit. As to their initial argument that the district court erred in holding them accountable for the leather bag, there is abundant evidence in the record outlining each role of the various members of the conspiracy and suggesting that each had knowledge that the leather bag contained drugs. As to the appellants' latter argument, in light of Detective Cuchta's undisputed extensive experience in drug trafficking, the district court was clearly entitled--despite some conflicting evidence in the record--to rely on Detective Cuchta's approximation as to the amounts of cocaine and marijuana contained in the leather bag because his testimony had " 'sufficient indicia of reliability to support its probable accuracy.' " U.S.S.G. Sec. 6A1.3; see also United States v. Hicks, 948 F.2d 877, 883 (4th Cir.1991) (due process requirements are satisfied where evidence relied upon by district court has "some minimal indicium of reliability beyond mere allegation" (citations and internal quotes omitted)).
 
 III
 
 32
 The appellants raise a whole litany of additional arguments which they contend should be resolved in their favor. We find no merit to these contentions. Accordingly, for the reasons stated herein, the judgments of the district court are affirmed.
 
 AFFIRMED
 
 
 [1]
 In any event, even if the circumstances escalated into a Terry stop, see Terry v. Ohio, 392 U.S. 1 (1968), which they did not, Deputy Sheriff Salcido had reasonable suspicion to justify a brief detention of Mark. Under Terry and its progeny, an officer may seize a person if the officer has reasonable suspicion that the person has just committed or is about to commit a crime. Id. at 21-22, 27; United States v. Sokolow, 490 U.S. 1, 7 (1989). Reasonable suspicion is more than a hunch but less than probable cause. See United States v. Hensley, 469 U.S. 221, 232 (1985). The presence or absence of reasonable suspicion is to be determined in light of the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. See United States v. Crittendon, 883 F.2d 326, 328 (4th Cir.1989). A Terry stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Royer, 460 U.S. at 500. We believe, under the totality of the circumstances, there was an adequate level of suspicion to provide Deputy Sheriff Salcido with a sufficient basis for briefly detaining Mark to investigate his conduct further. Deputy Sheriff Salcido had reasonable suspicion because Mark fit within what is commonly referred to as a drug courier profile. Deputy Sheriff Salcido knew that Mark had purchased a one-way ticket from a source city, appeared nervous at the time of purchase, paid in cash, and in small denomination bills. The stop in this case lasted no longer than necessary because Deputy Sheriff Salcido briefly questioned Mark in an effort not to cause any inconvenience or delay. Accordingly, assuming there was a seizure of Mark, it was a permissible one
 
 
 [2]
 We cannot take issue with the finding made below that Mark and Debbie have standing to contest the validity of the search
 
 
 [3]
 At the time Detective Cuchta applied for the search warrant, he was aware that drugs were previously present at the 57 Virginia Street residence. Detective Cuchta did not include drugs as an object of the search because Phelps indicated that he did not believe there were any drugs at the residence at that time
 
 
 [4]
 In fact, a warrant was unnecessary to seize the cocaine. See Horton v. California, 496 U.S. 128 (1990) (plain view seizure)
 
 
 [5]
 Mark and Debbie contend that the search of the 57 Virginia Street residence was pretextual. Because the search of the house was supported by probable cause, Detective Cuchta's subjective motivations behind conducting the search are irrelevant. Cf. United States v. Hassan El, 5 F.3d 726, 730 (4th Cir.1993) (any traffic stop which is legally justified at its inception is constitutionally valid for the purpose of a search later conducted on probable cause). In any event, there is nothing in this record that suggests that the search of the residence located at 57 Virginia Street was in fact pretextual
 
 
 [6]
 The argument in this section is mainly stressed by Ponko
 
 
 [7]
 The record reflects that Carman Matthews distributed drugs for Mark and Debbie
 
 
 [8]
 Baker met Mark in March 1992 and started dating him shortly thereafter. Baker testified that she used cocaine with Mark on numerous occasions
 
 
 [9]
 Ponko was sentenced on April 6, 1993, and Mark was sentenced on April 16, 1993
 
 
 [10]
 At Mark's sentencing, Detective Cuchta described his estimate as a "rather conservative" one. (J.A. 1191)