**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ennis FLOWERS, Defendant–Appellant.**

No. 89–1991.

United States Court of Appeals,
Sixth Circuit.

Argued May 3, 1990.

Decided May 21, 1990.

---

Yvonne V. Watford (argued), Office of the U.S. Atty., Detroit, Mich., for plaintiff-appellee.

John C. Mouradian (argued), Robert E. Slameka, Detroit, Mich., for defendant-appellant.

Before GUY and RYAN, Circuit Judges, and ENGEL, Senior Circuit Judge.

PER CURIAM.

Defendant, Ennis Flowers, appeals from a conditional guilty plea to a violation of 21 U.S.C. § 841(a)(1), possession of cocaine with intent to distribute. The plea followed the denial of a motion to suppress the cocaine that was seized from Flowers in an airport search. Flowers contends on appeal, as he did in his motion to suppress, that his fourth amendment rights were violated. Upon a review of the record made at the suppression hearing, we agree with the trial judge that no fourth amendment violation occurred.

I.

On May 11, 1988, Flowers arrived at Detroit Metropolitan Airport on a flight originating in Los Angeles, California. Upon deplaning, he was observed by Sergeant Jeriel Heard of the Wayne County Sheriff's Department and Romulus, Michigan, Police Detective Michael Odejko. Both Heard and Odejko were part of the Drug Enforcement Administration (DEA) Airport Group, and that morning were surveilling incoming flights from narcotics source cities such as Los Angeles.

The officers testified that their attention was attracted to Flowers because he was wearing what appeared to them to be "inappropriate" clothing for the time of year. He was wearing a loose-fitting sweatshirt and a lined denim jacket. It also appeared to the officers that Flowers was looking about nervously. The officers decided to follow Flowers and observed him by-pass the baggage claim area and exit the terminal. Flowers was carrying one piece of carry-on luggage. At this point in time, Sergeant Heard approached Flowers identifying himself as a police officer, and asked if he could speak with him. Flowers agreed without hesitation. Officer Heard asked if he could see Flowers' airline ticket and when it was produced Heard noted that it was a one-way ticket purchased with cash. Flowers had no identification with him other than his airline ticket. Heard then asked Flowers if he had ever been arrested and Flowers replied that he had been arrested for drug-related offenses.

Since the facts and information developed by this time indicated that Flowers fit the DEA drug courier profile, Heard asked if he could search the carry-on bag. Flowers readily agreed as the bag, in fact, contained no narcotics. Heard noticed, however, that Flowers appeared to have an unusually rigid posture and an abnormal bulge around his waist given that he was a person of relatively small stature. Heard then sought permission to search Flowers' person to which Flowers replied, "Sure," followed by, "Can I work with you? I can get you twenty kilos." The subsequent search uncovered two kilos of 90 percent pure cocaine in ziplock bags taped to Flowers' stomach.

This entire episode took five minutes or less. At no time did the officers have their guns drawn or otherwise position themselves in a manner that suggested Flowers was not free to leave. Flowers was not taken away from the location of the original encounter.[1]

---

1. Flowers' version of these events did not differ significantly from the officers. To the degree

## II.

■ From the plethora of airport search cases now reported, it is clear that there are three distinct types of contact that occur between police officers and the travelling public. The first is contact initiated by a police officer without any articulable reason whatsoever. This contact and its consequences are referenced in *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983), as follows:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. See *Dunaway v. New York, supra* [200] at 210, n. 12 [99 S.Ct. 2248, 2255 n. 12, 60 L.Ed.2d 824 (1979)]; *Terry v. Ohio,* 392 U.S. [1] at 31, 32–33 [88 S.Ct. 1868, 1885–86, 20 L.Ed.2d 889 (1968)] (Harlan, J., concurring); *id.,* at 34 [88 S.Ct. at 1886] (WHITE, J., concurring). Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. *United States v. Mendenhall,* 446 U.S. 544, 555 [100 S.Ct. 1870, 1877, 64 L.Ed.2d 497] (1980) (opinion of Stewart, J.).

*See also United States v. Collis,* 699 F.2d 832, 834–35 (6th Cir.), *cert. denied,* 462 U.S. 1119, 103 S.Ct. 3088, 77 L.Ed.2d 1349 (1983).

The second type of contact is that predicated upon "reasonable suspicion"—the classic *Terry* stop.[2] The temporary detention of a person meeting the drug courier profile would be an example of this type of police-citizen contact which, although constituting a seizure, would not offend the fourth amendment.

The third type, seldom found in the context of airport cases insofar as the initial contact is concerned, is when the officers have probable cause to believe a crime has been committed and that the person stopped committed it. In such situations the seizure may, in fact, be an arrest.

Flowers' argument on appeal is difficult to follow because he fails to distinguish the different legal consequences that flow from the different types of contact. The problem, as is usually the case, is further exacerbated by the police officers' testimony at the suppression hearing which appears geared to maximize the "suspicious" conduct of the defendant. Here, for example, the officers' testimony about loose-fitting sweatshirts and lined denim jacket, unwittingly perhaps, directs the initial analytical focus in the wrong direction. These officers did not have an "articulable suspicion" basis for stopping Flowers. If this stop is to pass muster, and we conclude it does, it is because it properly falls within the first category of permissible police-citizen encounters.

■ The police officers' approach to Flowers was low-key, non-intimidating, and noncoercive. He was asked simple questions and gave direct non-compelled answers. If one of the questions asked, as was the case here, is "may we search your luggage or person," and the answer is a voluntary and uncoerced "yes," then the initial questioning still has not become a seizure for fourth amendment purposes. *See United States v. Collis,* 766 F.2d 219, 221 (6th Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985). There is no doubt, however, particularly where searches of the person are involved, that the voluntariness of the search merits close scrutiny. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Needless to say, when the cocaine was discovered and removed from the person of Flowers, a seizure occurred, but at that point in time the officers had probable cause for the seizure.

that there were differences, the trial judge credited the officers' version and we cannot say that this credibility determination was clearly erroneous.

**2.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In sum, then, we find the initial contact between the officers and Flowers to have had no fourth amendment implications; we find the searches to have been consensual; and we find the seizure to have been based on probable cause.[3]

AFFIRMED.

---

**3.** The district court and the government on appeal relied heavily on our recent decision in *United States v. Garcia*, 866 F.2d 147 (6th Cir. 1989). *Garcia* supports the result reached in this case, but differs in that in *Garcia*, we found that the initial contact between the defendant and the police led to reasonable suspicion which preceded the ultimate consensual search. Were we to apply the *Garcia* template to the facts here, we would conclude that the information developed in the initial stop did lead to reasonable suspicion on the part of the officers.